**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| Johana Colon, Christine Rundberg, and Anthony Womack, on behalf of the Advanced Diagnostic Group Employee Stock Ownership Trust, and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>Moore & Van Allen PLLC and Michael E. Zeller,<br><br>Defendants. | Case No.: 3:26-cv-25-MOC-WCM<br><br>**SECOND AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DECLARATORY RELIEF REQUESTED**<br><br>**DEMAND FOR A JURY TRIAL** |

## NATURE OF THE ACTION

1. This case concerns professional malpractice by legal counsel to the trustee of the Advanced Diagnostic Group ("ADG") Employee Stock Ownership Trust ("ESOT"),[1] who failed to diligently advise the ESOT trustee with respect to the ESOT's interests due to his undisclosed personal, professional, and financial interests adverse to the ESOT.

2. Defendant Michael E. Zeller, a member of Defendant Moore & Van Allen PLLC ("MVA"), was retained to serve as independent legal counsel to GreatBanc Trust Co. ("GreatBanc"), the outside trustee of the ESOT. GreatBanc retained Defendants solely in its capacity as ESOT trustee charged with serving the interests of the ESOT and its beneficiaries. The engagement started with Defendants advising GreatBanc concerning the ESOT's potential acquisition of ADG, a Florida diagnostic imaging company, from its owners.

[1] An employee stock ownership plan ("ESOP") is a retirement plan and the ESOT is the legal trust that holds the ESOP's shares for employees. An ESOT implements and is part of an ESOP.

3. Unbeknownst to GreatBanc, Zeller owned part of the financial advisory firm serving ADG's owners in the sale, ButcherJoseph. Zeller and ButcherJoseph had a scheme wherein ButcherJoseph would advise its clients which trustee to hire for ESOT deals and then recommend MVA as "independent" counsel to the trustee. This scheme resulted in significant legal fees for Defendants. In turn, Zeller would provide legal advice to the trustee that resulted in the ESOT agreeing to terms that were favorable to ButcherJoseph's clients and unfavorable to the ESOT's interests. Zeller's pliability further benefited ButcherJoseph and MVA through repeat engagements and referrals from satisfied business owners and their advisors.

4. Zeller and his confederates had another angle, too. They would invest their own money into ESOP-owned companies by acquiring promissory notes and stock warrants issued by the company, even where Zeller served as "independent" counsel to the ESOT trustee. These investments were implemented through ButcherJoseph's affiliated firm, Mosaic Capital, and private funds that it created and managed (collectively, "Mosaic"). Mosaic believed that notes and stock warrants issued by ESOP-owned companies generated superior risk-adjusted returns. It helped that one of their own was secretly legal counsel to the company's shareholder.

5. To raise funds for Mosaic's investment strategy, Zeller acted as legal counsel to Mosaic and the contact point for investors. At least half a dozen MVA lawyers put money into Mosaic and designated Zeller as their agent. Their investment in Mosaic was not a secret at MVA and financial transactions were handled through MVA's client trust account.

6. Zeller and MVA played all these parts with respect to the ADG ESOT. ButcherJoseph handpicked Zeller and MVA to serve as counsel to GreatBanc knowing that Zeller would defer to the interests of ButcherJoseph's clients, sign off on deals that were not in the ESOT's interests, ignore red flags, and ensure that ButcherJoseph's clients came out better

than MVA's client in the end. Mosaic invested in ADG's notes and stock warrants knowing that its investors had a backstop against adversity with the company's shareholder due to Zeller's position with the ESOT.

7. No independent advisor to the ESOT would have sanctioned the transactions that followed during Zeller's service as legal counsel to the trustee. As it turned out, the ESOT was created, operated, and terminated as part of a corporate heist by ButcherJoseph's clients. The scheme was to get paid for the company twice, first by selling it to the ESOT, then by selling it again. To accomplish this, ADG's pre-ESOT owners abused their positions at the company to divert ADG's capital, intellectual property, equipment, referral sources, employees, corporate opportunities, and other assets to shell companies owned by them. The second sale to healthcare conglomerate Akumin commanded $212 million. Yet the ESOT and its beneficiaries received only $10 million. Most of the rest went to ButcherJoseph's clients and Mosaic.

8. Zeller had a leading role in delivering this bounty. He advised GreatBanc that dealings between ADG and ButcherJoseph's clients were at arms-length, and he never advised GreatBanc to investigate red flags or use its shareholder rights under Florida law to challenge ButcherJoseph's clients. Diligent and loyal counsel to the trustee would have scrutinized transactions between ADG and its former owners and advised GreatBanc to seek remedies for the benefit of the ESOT when the true circumstances were uncovered.

9. Plaintiffs were ADG employees and beneficiaries of the ESOT whose distributions were dramatically reduced by the unchecked scheme to divert value from the ESOT. Plaintiffs now assert a claim for legal malpractice against Defendants on behalf of the ESOT and its beneficiaries to recover the value the ESOT would have realized had its trustee been represented by diligent and loyal counsel.

## PARTIES AND RELEVANT THIRD PARTIES

10. The ESOP was an employee benefit plan, sponsored by ADG Acquisition Holdings Inc., a Florida corporation. The ESOT was established as part of the ESOP to hold the ESOP's assets on behalf of Plan participants. The ESOP's purpose was to invest in ADG stock as a retirement benefit for participants, who were ADG employees. Around 185 ADG employees became vested and received distributions from the ESOP. More than 90% of the ESOT's beneficiaries reside in Florida.

11. Plaintiff Johana Colon is a natural person residing in Tampa, Florida. She worked for ADG as an X-ray Technologist and MRI Technologist during the ESOT period and was a beneficiary of the Trust.

12. Plaintiff Christine Rundberg is a natural person residing in Orlando, Florida. She worked for ADG as a front desk clerk from the start of the ESOT period until around May 2017 and was a beneficiary of the Trust. She was formerly known as Christine Chong.

13. Plaintiff Anthony Womack is a natural person residing in Tampa, Florida. He worked for ADG as a Lead MRI Technologist throughout the ESOT period and was a beneficiary of the Trust.

14. Defendant Moore & Van Allen PLLC is a North Carolina law firm headquartered in Charlotte, North Carolina. According to MVA, no members are Florida residents. MVA advised GreatBanc solely in its capacity as trustee to the ESOT for the benefit of the ESOT and its beneficiaries.

15. Defendant Michael E. Zeller is an MVA member and co-head of the firm's ESOP Transactions practice. Zeller led MVA's engagement as counsel to the trustee for the benefit of the ESOT and its beneficiaries. Zeller was also part owner of ButcherJoseph and the Mosaic fund

that invested in ADG during the relevant period. Zeller is a resident of North Carolina, and he is licensed in North Carolina and New York.

16. GreatBanc Trust Company is an Illinois corporation headquartered in Lisle, Illinois. GreatBanc was the ESOT trustee throughout the ESOT period and until March 2022, when the last distribution from the ESOT was completed.

17. ButcherJoseph is a Delaware corporation headquartered in St. Louis, Missouri. It describes itself as a financial advisor that specializes in advising "privately held businesses on ownership succession transactions." One of its founders is a former MVA attorney and close personal friend of Defendant Zeller.

18. Mosaic is a private investment firm based in North Carolina. Mosaic is related to ButcherJoseph by common ownership and control. One of its founders is a former MVA attorney and close personal friend of Defendant Zeller.

## JURISDICTION AND VENUE

19. This Court has jurisdiction under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This action was originally filed in state court in Florida. In removing the action to federal court, MVA asserted that no members reside in Florida. Plaintiffs lack information to state otherwise. This Court has personal jurisdiction because Defendants reside in this District. The Middle District of Florida transferred venue to this District.

## JURY DEMAND

20. Plaintiffs demand a jury trial on all issues so triable.

## FACTUAL ALLEGATIONS

### I. BACKGROUND ON LEVERAGED ESOPS

21. ESOPs offer benefits to employees, the company, and the selling shareholders. For employees, an ESOP is a retirement plan that grants them a stake in the company. Essentially, it's a benefit where employees receive shares turning them into part-owners. The rationale behind an ESOP lies in fostering employee motivation and loyalty, as having a vested interest in the company's success aligns employees' efforts with the company's growth. If the firm prospers, the stock value increases and provides a tangible financial reward to employees. Effectively implemented, ESOPs can offer a rewarding retirement investment for employees.

22. For the company, an ESOP enables substantial tax savings. When an ESOP-owned company elects to be treated as a Sub-Chapter S Corporation as ADG did, there are no federal income taxes at the corporate or shareholder level. This creates a competitive advantage whereby the tax savings can be reinvested back into the business to fuel growth by purchasing new equipment, hiring more employees, repaying debt, or making contributions to the ESOP.

23. Finally, for owners who sell to an ESOP, creating an ESOP allows deferment of capital gains on their ownership interest in the sale. These tax savings can be significant and are often the primary motivator for an owner to consider a sale to an ESOP. Creating an ESOP can therefore be an attractive exit strategy for a business owner.

24. At the core of the growth of the ESOP industry is the leveraged ESOP. In a leveraged ESOP transaction, the ESOP borrows money from the company to purchase the company's stock.

### II. THE ROLE OF AN ESOT TRUSTEE AND ITS COUNSEL

25. In an ESOP formation transaction, the workers who stand to acquire company stock are not direct parties to the transaction. Instead, they are represented by an "ESOT trustee"

who serves as their advocate, retained and paid by the company to represent the interests of employees. It is the trustee's duty to act exclusively for the benefit of the ESOT and negotiate to complete a transaction at the lowest possible price with adequate protections in place to protect the ESOT's investment.

26. Effective ESOPs are characterized by a vigilant and involved trustee who adheres to its fiduciary duties and prioritizes the interests of the trust and its beneficiaries. The trustee is expected to act as an impartial third-party purchaser, steadfastly aiming to negotiate the lowest possible price, counterbalancing the typical seller's goal of obtaining the highest price. A trustee must be willing to walk away from a deal to avoid causing the ESOP to pay more than fair market value for the company stock or commit to an investment without adequate protections, even if walking away might be adverse to the trustee's own business interests. The trustee's role involves a thorough examination of the valuation of a business and the potential for the business to generate a favorable investment return for the prospective ESOP.

27. Trustees in turn often hire legal counsel to advise them on the exercise of their fiduciary duties and to review potential transactions, including not only the sale agreement but also concurrent and contingent arrangements related to financing, managing, or selling the company after the ESOP invests. As the legal advisor to the independent fiduciary of the ESOP, it is expected that the trustee's counsel will not have interests that conflict with the ESOP. Likewise, attorneys' ethical obligations require attorneys to ensure they do not have interests that are adverse to their clients. The trustee's legal counsel must ensure that all processes required by law to protect the ESOP are followed competently and in good faith. The trustee's legal counsel must also advise the trustee of risks faced by the ESOP, and the legal means available to curtail those risks, or remedy harm done to the ESOP.

28. A trustee's legal counsel typically plays a substantial role in an ESOP transaction and makes decisions that are given only a cursory review and approval by the trustee. It is typical for the trustee's attorney to spend as much or more time on a transaction than the trustee itself.

## III. THE ROLE OF INVESTMENT FIRMS LIKE BUTCHERJOSEPH

29. Due to the tax savings associated with selling to an ESOP and the significant degree of control sellers may enjoy in such transactions, there is an industry of advisors and consultants who are experienced with leveraged ESOP transactions. Such professionals often describe themselves as investment bankers and financial advisors and assist businesses in crafting and closing these complex financial transactions. Importantly, they represent the sellers and work to ensure the sellers receive the best price and most favorable terms.

30. ButcherJoseph is one such consultant that provides ESOP transaction advice to sellers. ButcherJoseph describes itself in marketing materials as a financial advisor that specializes in advising "privately held businesses on ownership succession transactions." ButcherJoseph specializes in ESOP transactions, maintaining a robust pipeline of ESOPs referred to it by law firms, tax advisors, lenders, and business owners.

31. Mosaic, according to its marketing materials, is "an employee ownership focused private equity firm, investing in lower middle market companies ranging from $3 to $12 million of EBITDA." Additionally, "Mosaic leverages its principals' unique expertise in Employee Stock Ownership Plans (ESOP) to structure each transaction as an ESOP buyout."

32. One way that ButcherJoseph tilts the field in sellers' favor is including stock warrants in ESOP formation transaction financing. Warrants are contracts that give sellers the right to purchase shares in the future at a predetermined price, thereby diluting the ESOP's stake in a future sale. Sellers and their financial advisor like ButcherJoseph exercise substantial

influence over the financing the ESOP must use to acquire the company and typically craft the initial proposal and financial models to serve sellers' interests.

33. Another way that ButcherJoseph aids its seller clients is helping to craft governance and employment terms suited to the sellers' desired level of freedom and control after the sale.

34. Ultimately, the ESOT trustee must negotiate and approve the financing and governance terms from the employees' perspective. These terms have a substantial impact on the value of the ESOP's investment, and the negotiation typically plays out directly between the company-side advisors and the ESOT trustee's counsel. If the company-side advisors and investors have an ally advising the ESOT trustee, there is an unnatural advantage.

## IV. NATURE OF DEFENDANTS' MALPRACTICE

### A. The Relevant Actions and Omissions Were Concentrated in Florida.

35. ButcherJoseph solicited ADG's owners in Florida, asserting that the firm works with clients throughout the United States on ESOP transactions. Zeller personally helped ButcherJoseph win the job with ADG before an ESOT trustee was engaged, which he later disclosed to another MVA partner.

36. ButcherJoseph then recommended GreatBanc as ESOT trustee and asked GreatBanc to hire Defendants as "independent" legal counsel. Defendants' engagement was made official when Zeller's MVA partner—himself a Mosaic investor and the same partner to whom Zeller disclosed his work on behalf of ButcherJoseph to win the ADG job—traveled to Florida to meet with GreatBanc, ADG's owners, and ButcherJoseph representatives and sign the engagement agreement. MVA thus knowingly benefited from Zeller's work soliciting ADG's owners in Florida and sent a representative to Florida to formalize the engagement.

37. MVA's engagement called for ADG to pay GreatBanc's legal fees. MVA sent invoices to ADG in Florida, and ADG made payments to MVA from its bank accounts in Florida throughout the life of the ESOT.

38. During ButcherJoseph's solicitation of ADG's owners, ButcherJoseph indicated that it would like to have the opportunity for Mosaic to invest in the promissory notes and stock warrants that were expected to be issued by ADG to ButcherJoseph's clients as part of the ESOT formation transaction. After the ESOT formation transaction, Mosaic completed that investment in two transactions by buying notes and stock warrants from ADG's prior owners. The notes and stock warrants acquired by Mosaic had a Florida choice of law and venue clause.

39. Zeller knew that he was investing in a Florida company through Mosaic while also serving as the supposed independent legal counsel to the company's ESOT trustee. Zeller received a capital call from Mosaic that specifically referred to Mosaic's ADG transactions, and Zeller satisfied the capital call and subsequently maintained his investment in Mosaic.

40. Defendants' professional malpractice concerned the ESOT's rights under Florida law. The prudent guidance that Zeller failed to give, and the careless and disloyal advice that he did give, concerned the ESOT's rights as ADG's shareholder under Florida corporate law.

**B. Defendants Committed Professional Malpractice with Respect to the ESOP Formation Transaction.**

41. GreatBanc began acting as trustee of the putative ESOT on September 23, 2015. The engagement agreement stated that GreatBanc would continue to serve as trustee until it resigned or was removed by ADG. GreatBanc was required to "engage its own independent legal counsel."

42. On October 13, 2015, GreatBanc and MVA executed their engagement agreement. The agreement provided that MVA would assist GreatBanc in its review of the

formation transaction and stated that MVA would "provide legal services to GreatBanc Trust Company . . . in connection with the adoption and implementation by Advanced Diagnostic Group or an affiliate thereof . . . of an Employee Stock Ownership Plan and the related trust to be established thereunder." It further provided that MVA "understands that GreatBanc has agreed to serve as the sole trustee of the ESOP which is being adopted and implemented by the Company in connection with a series of transactions which would result in the ESOP's acquiring, either directly or indirectly through a holding company, 100% of the equity interests in the Company (collectively, the 'Proposed Transaction.')."

43. Through the engagement agreement, MVA agreed to "provide legal services to GreatBanc in connection with (i) the evaluation of whether to proceed with the Proposed Transaction, and (ii) if GreatBanc agrees to the terms of the Proposed Transaction, the closing of the Proposed Transaction, all in a professional manner and in accordance with applicable legal and ethical standards." It also provided that MVA would advise on "post-closing matters . . . in connection with the maintenance and administration of the ESOP." MVA "anticipate[d] a long and mutually satisfactory relationship."

44. Due to the complex and specialized nature of leveraged ESOT transactions, trustees like GreatBanc rely heavily on their outside valuation advisor and legal counsel. This was particularly true here, as the transaction involved a host of concurrent and contingent agreements, including employment contracts for the sellers, seller notes, warrants, an investor rights agreement, a shareholder management services agreement, change of control provisions, and non-compete provisions. Additionally, GreatBanc has a limited staff of 50–75 employees responsible for trusteeing more than 500 ESOTs. As a practical matter, GreatBanc relies on its

legal and financial advisors to conduct due diligence and recommend actions that serve the interests of its ESOTs and their beneficiaries.

45. Unbeknownst to GreatBanc—because Defendants never disclosed it—Zeller was a shareholder of ButcherJoseph and a partner in Mosaic at the time of the ESOP formation transaction and all times thereafter. GreatBanc knew that ButcherJoseph was leading the ESOT negotiation for ADG's owners and would not have hired or relied on Zeller to advise GreatBanc with respect to its services on behalf of the ESOT had it known that Zeller was part owner of ButcherJoseph and its affiliated investment arm that expected to invest in the deal.

46. The ESOT was officially established on December 8, 2015. The ESOT, through GreatBanc and Zeller, approved or entered into all of the necessary transaction documents to complete the acquisition of ADG on December 11, 2015. In the deal, the ESOP purchased all of ADG's common stock from the sellers based on an enterprise valuation of around $80 million. In exchange for their ADG shares, the sellers received a combination of cash, notes carrying 12% interest, and warrants to purchase up to 40% shares of ADG stock in the future. They also received their preferred employment and governance terms, including terms that allowed outside business activities in the same industry.

47. As it turned out, these agreements would lay the foundation for the scheme perpetrated by the ADG sellers to divert value from the ESOT-owned ADG to themselves. Shortly after they began working with ButcherJoseph on selling ADG to an ESOT, ADG's owners created shell companies through which they could enjoy future growth and profits of ADG's business. Just months or weeks before the ESOT formation transaction closed, but well after engaging ButcherJoseph to start the ESOT formation process, ADG's owners structured new ADG clinics through the shell companies to allow the benefits of future growth of the

business to be retained by themselves. Yet these were not separate businesses, and the new clinics depended at all times on ADG's cash, equipment, credit, employees, and other assets and resources to conduct business and to thrive.

48. Zeller and MVA were responsible for blessing the shell company arrangement that ADG's owners used to divert value from the ESOT. Defendants' services in this respect failed to meet the standard of care for independent counsel to an ESOT trustee. No diligent legal counsel loyal to the ESOT's trustee would have advised GreatBanc as Zeller did.

49. First, Zeller failed to advise GreatBanc to conduct any due diligence to determine if the supposed outside business activities that ButcherJoseph's clients would be permitted to engage in were in fact "outside" of ADG. Minimal due diligence would have shown that they were not. One of the supposed "outside" clinics was acquired just two months before the ESOT formation transaction closed using cash sourced directly from ADG's checking account. The clinic had also begun operating under the "Advanced Diagnostic Group" name, a fact that was registered publicly with the Florida Secretary of State. Another supposed "outside" venture was a startup in Georgia for which ADG held the clinic lease and the equipment contracts—the only material steps that had been taken at that point to establish the clinic. These facts were available to Zeller in the ESOT transaction documents. Had all the facts and circumstances concerning the supposed "outside" businesses been discovered and brought to GreatBanc's attention, the ESOT would have negotiated stronger protections for ADG's interests in the new clinics.

50. Second, Zeller affirmatively advised GreatBanc that a proposed agreement between the supposed "outside" ADG clinic and ADG appeared to be "arms-length." Zeller made no effort to independently investigate whether that was true. He simply relied on statements from his ButcherJoseph friends and clients and parroted their conclusion back to

GreatBanc. The agreement in question—for ADG to manage the clinic that it had just invested nearly a million dollars into and put its name on in exchange for a $2,000 per month management fee, while ButcherJoseph's clients got everything else—was not arms-length. ADG lost money on back-office services for the clinic alone, and fair compensation for such services only scratches the surface of the inequities in the deal. No diligent and loyal legal advisor would have advised GreatBanc that the deal appeared to arms-length based solely on the counter party's word, as Zeller did.

51. Zeller further advised GreatBanc to enter into a corporate governance agreement called the Investor Rights Agreement ("IRA"). The IRA was a "shareholder agreement" entered into under the Florida Business Corporation Act, Fla. Stat. § 607.0732. Through the IRA, the ESOT yielded broad shareholder powers to ButcherJoseph's clients, including by allowing ButcherJoseph's clients to control director nominations and by agreeing to not alter the director nomination process or otherwise amend ADG's bylaws. The IRA also stipulated to how ESOT shares pending allocation to individual ESOP participants would be handled if the company was sold after a few years. This provision was decidedly favorable to ButcherJoseph's clients. The ESOT would only get credit for half of its unallocated shares in a future sale. The upshot of this was that if the company was sold after a few years, holders of stock warrants issued for 40% of the total shares could claim *the majority* of the equity value of the company.

52. Under these circumstances, given that ButcherJoseph's clients planned to divert value from ADG, Mosaic planned to invest in the stock warrants, and Zeller concealed from GreatBanc that he had personal investments in both ButcherJoseph and Mosaic, Defendants acted negligently and disloyally by advising GreatBanc to enter into the IRA.

53. GreatBanc relied on Zeller's advice in all these respects when it entered into the ESOP formation transaction. GreatBanc accepted Zeller's judgment that the ESOT's interests were adequately protected in the deal and that the arrangements between ADG and ButcherJoseph's clients appeared to be arms-length. Had Zeller advised GreatBanc to negotiate stronger protections for ADG's interests in supposed "outside" clinics and a more favorable governance agreement, ESOT beneficiaries would have been better protected in the transactions that followed and received higher distributions from the ESOT in the end.

**C. Defendants' Professional Malpractice Continued During the ESOT Period.**

54. After the ESOP was formed, GreatBanc continued to serve as the ESOT's trustee. In that role, GreatBanc retained responsibility for annual valuations, for bringing litigation when necessary to protect the ESOT, to attend all shareholder meetings of the Company, and to perform any and all other acts in its judgment necessary or appropriate for the proper and advantageous management, investment, and distribution of the ESOT's asset, ADG stock, for the benefit of ADG employees.

55. GreatBanc continued to rely on Zeller and MVA to provide legal advice on how best to perform its duties and protect the ESOT and its beneficiaries. The engagement expressly contemplated post-closing services and a long relationship, and neither side terminated the attorney-client relationship.

56. Zeller continued to conceal from GreatBanc that he was part owner of ButcherJoseph. He also concealed from GreatBanc that he became an investor in ADG stock warrants when Mosaic completed its intended investment in 2016 and 2017. MVA failed to disclose to GreatBanc that numerous other MVA attorneys also maintained personal investments in Mosaic.

57. Standard governance practices to protect the shareholder lapsed during the ESOT period, and Zeller never advised GreatBanc of its governance rights and duties. Critically, there were no annual shareholder meetings or director nominations for GreatBanc to consider and tender its votes. The IRA and bylaws required that a five-member board be seated once the ESOT took ownership, but that never happened. The same three directors from before the ESOT acquisition—two of ButcherJoseph's clients and their personal friend who described himself as a "patsy"—continued to constitute the board until that oversight was discovered by Akumin and superficially corrected on the day the ESOT was terminated.

58. Although the IRA gave ButcherJoseph's clients substantial control of ADG's corporate governance, it did not write the ESOT out of the governance process entirely. Zeller and MVA, as the trustee's legal counsel, caused the ESOT's governance rights to lapse by failing to advise GreatBanc to enforce its rights. This was not a merely technical fault—foregoing governance procedures hindered GreatBanc from meaningfully monitoring ADG and holding its directors accountable during the ESOT period.

59. In place of regular governance practices, Zeller and MVA were called to service only as needed to approve self-dealing by ButcherJoseph's clients. During this period, ButcherJoseph's clients accelerated and expanded their scheme to divert value from ADG to shell companies and needed Zeller to advise GreatBanc to stand down and sign off on their self-serving actions.

60. In one example in 2017, ButcherJoseph's clients contacted Zeller directly to ask if he still represented the ESOT's trustee. Zeller confirmed. ButcherJoseph's clients then explained to Zeller that they needed GreatBanc to approve a transaction between themselves and ADG.

Zeller alerted GreatBanc and coordinated the requested approval. MVA billed ADG in Florida for this work.

61. The transaction was the proposed sale back to ADG of the supposed "outside" ADG clinic held by ButcherJoseph's clients through a shell company. Because the majority of ADG's board was conflicted, the transaction could be voided under Florida law unless the shareholder approved the transaction. *See* Fla. Stat. § 607.0832 (2017). Zeller's job was to advise GreatBanc on whether to provide the requested approval on behalf of the shareholder, the ESOT.

62. Zeller's work failed to the meet the standard of care for an attorney advising a corporate shareholder in connection with the requested action. He advised GreatBanc that he had no concerns about the transaction two days after he learned about it. He allowed GreatBanc to rely solely on the word of ButcherJoseph's clients that the transaction was fair to ADG, and he did not advise GreatBanc to request necessary due diligence records or undertake a careful independent investigation of the circumstances of the proposed transaction.

63. Appropriate due diligence would have shown that ADG already owned the clinic—or at least a strong claim for corporate usurpation and waste. ADG had originally contracted to buy the clinic. ButcherJoseph's clients substituted their shell company as the buyer at the last minute, weeks before the ESOT formation transaction, but still pulled cash directly from ADG's checking account to complete the transaction. They then made ADG operate the clinic as an ADG-branded center—using ADG's employees, business resources, referrals, equipment, and other assets—for 18 months before asking Zeller to approve a deal whereby ADG would pay their shell company three times the original price. Appropriate inquiry into the proposed business combination that included prior sales and valuations, public business name

filings, and operational matters would have revealed that ADG was being used improperly to create a cash windfall for its directors and officers.

64. At that point, Zeller should have advised GreatBanc to decline to provide shareholder approval to the transaction. He further should have explained GreatBanc's right to pursue legal action against ButcherJoseph's clients for corporate usurpation and waste under Florida law as a remedy for the disloyal actions that created the proposed deal. *See, e.g.*, *Cohen v. Hattaway*, 595 So. 2d 105, 108-09 (Fla. Dist. Ct. App. 1992). He abdicated these duties and advised GreatBanc to approve the transaction on behalf of the ESOT, and GreatBanc did so in reliance on Zeller's advice. The transaction closed on the terms presented, and the ultimate distributions available to ESOT beneficiaries were reduced as a result of this windfall given to ButcherJoseph's clients.

65. Later in 2017, Zeller was called into service again to approve another related-party transaction. This time, ButcherJoseph's clients wanted to buy a diagnostic imaging company with a presence in the non-competition zone established under the terms of the original sale of ADG to the ESOT. The target company was a long-time acquisition target of ADG, but ButcherJoseph's clients wanted to do the deal themselves through a new shell company. They asked ButcherJoseph for advice on how to proceed, and ButcherJoseph advised them to obtain ESOT approval of their acquisition of the target company and get the ESOT to waive the competition bar. ButcherJoseph advised that there was too much risk to doing the deal without ESOT approval, and no risk to seeking ESOT approval, as the trustee would definitely approve.

66. Zeller delivered as ButcherJoseph predicted he would. He advised GreatBanc that he had no concerns with the transaction and that GreatBanc should provide the requested consent and waiver. Again, he relied on self-serving representations from ButcherJoseph's clients that

granting approval was fair and in the interests of the ESOT. He did not advise GreatBanc to conduct due diligence concerning ADG's financial wherewithal to do the deal itself, competition between the two companies, or whether ADG would manage the target after the deal and the terms for such relationship.

67. Had the necessary due diligence been conducted, GreatBanc would have learned that ADG had the financial wherewithal to acquire the target company itself with new lending partners with which ADG was in active discussions prior to asking GreatBanc to approve the outside acquisition. The hindrance was not ADG's financial wherewithal but rather its directors' ultimate exit strategy. At the time, ADG's directors wanted to keep ADG's powder dry so that they could resell the target company to ADG at a profit after 1-2 years. Due diligence also would have shown that ADG and the target company did compete, contrary to the representations of ButcherJoseph's clients. Worse than that, *ADG* had to agree to cede territory to the target company. Due diligence further would have revealed that ADG's directors intended to implement synergies for the benefit of the target company by gifting ADG resources—and even a whole ADG clinic—to the target company. Yet because Zeller failed to advise GreatBanc to inquire into the post-deal relationship between the companies, no protections or compensation for use and transfer of ADG assets was negotiated.

68. Zeller should have advised GreatBanc to object to the proposed transaction or negotiate protections for ADG with respect to competition between the companies and compensation for use of ADG assets. He abdicated his duty to provide diligent and loyal counsel to GreatBanc concerning the interests of the ESOT, and GreatBanc accepted the transaction in reliance on Zeller's advice. The transaction closed in early 2018 without adequate protections for


Case 3:26-cv-00025-MOC-WCM Document 97 Filed 07/22/26 Page 19 of 36

the ESOT's interests, and the distributions ultimately made to ESOT beneficiaries were reduced as a result.

### D. Defendants' Professional Malpractice Continued in the ESOP Termination Transaction.

69. In early 2019, ButcherJoseph's clients found an opportunity to complete their desired second sale through an outside strategic buyer, Akumin. They asked GreatBanc to approve the sale of ADG in the deal, which would require terminating the ESOT.

70. GreatBanc knew that additional work would be required both with respect to the transaction and winding down the ESOT after the sale, if the deal was consummated. GreatBanc therefore negotiated a new fee agreement with ADG covering this work. The agreement provided that GreatBanc would continue to utilize independent legal counsel.

71. The proposed Akumin transaction was the culmination of the scheme perpetrated by ButcherJoseph's clients. ADG and the shell companies would be sold as a package deal for $212 million, with the ESOT only participating in the proceeds attributed to ADG, and ButcherJoseph's clients claiming all the proceeds attributed to the shell companies. Further, Mosaic and ButcherJoseph's clients would cash in all of their ADG stock warrants, claiming a piece of the ADG proceeds from the ESOT.

72. Zeller and MVA accepted the continuing work on behalf of the trustee and entered into a new fee agreement with GreatBanc. The fee agreement called for a retainer deposit and projected total fees related to the transaction and termination of the ESOT of three to four times the retainer amount. The fee agreement made clear that Zeller and MVA would advise the trustee "in connection with matters involving the ESOP, and a proposed Transaction involving the prospective sale of ADG Acquisition Holdings, Inc. to Akumin, Inc." It further stated that

"Representation of GreatBanc does not constitute, and is not, a representation of the Company [ADG] or any of GreatBanc's affiliates."

73. Despite the fact that the proposed Akumin deal called for a large amount of money to be divided between ButcherJoseph's clients, Mosaic, and the ESOT, Defendants failed to disclose to GreatBanc that Zeller was part owner of ButcherJoseph or that Zeller and other MVA attorneys maintained personal investments in Mosaic.

74. The initial proposal to the ESOT from ButcherJoseph's clients was that it would receive around $9 million of the $212 million. Zeller received this proposal on behalf of GreatBanc and the ESOT. As for the rest, around $100 million would be paid to the shell companies for the benefit of ButcherJoseph's clients and their partners. Around half of the $100 million was associated with a Georgia imaging venture, and around half with the firm that Zeller had allowed ButcherJoseph's clients to acquire in the non-competition zone just one year earlier. The balance of the $212 million would be paid to ADG's outside lenders and its note and warrant holders, including ButcherJoseph's clients and Mosaic.

75. Just as he had throughout the life of the ESOT, Zeller failed to undertake the diligence required of his role. He failed to advise GreatBanc to scrutinize the $100 million in proceeds going to ButcherJoseph's clients through the shell companies. Close scrutiny of the $100 million was necessary because that amount could not be reconciled with what Zeller knew or should have known about the supposed "outside" business interests of ADG's directors.

76. First, the only disclosed "outside" clinic in operation at the time of the ESOT formation transaction three years earlier was managed by ADG until ADG's directors caused ADG to acquire the clinic (*see supra* ¶¶ 49-50, 60-64).

77. Second, the potential Georgia imaging business associated with ADG and its directors at the time of the ESOT formation transaction was a startup for which ADG held the contracts (*see supra* ¶ 49).

78. Third, under the ESOT formation terms, ADG was supposed to receive fair compensation pursuant to a written agreement if any ADG resources were used in connection with future "outside" businesses.

79. Fourth, no agreement for shared resources between ADG and the supposed "outside" businesses receiving $100 million in the Akumin deal was presented or known to Zeller.

80. Fifth, the firm that ADG's directors acquired one year earlier notwithstanding the competition bar was valued at only $17 million in that transaction.

81. Juxtaposed against what Zeller knew or should have known, the question of how ADG's directors accumulated $100 million worth of "outside" imaging center interests in the three years since the ESOT formation transaction loomed large. Prudent trustee counsel would not have ignored the question as merely a valuation question for the financial advisors. It was a legal question bearing directly on the ESOT's rights under corporate law and the agreements entered into as part of the ESOT formation transaction concerning "outside" business interests and shared resources.

82. Zeller should have advised GreatBanc to demand records demonstrating how the supposed "outside" interests were acquired, how the shell companies were capitalized, and the terms governing any shared resources between ADG and the supposed "outside" businesses. Instead, he relied on the word of ButcherJoseph's clients that ADG's valuation for purposes of

the Akumin sale had nothing to do with the outside businesses. Zeller inquired no further and neither did GreatBanc, trusting and relying on Zeller's judgment.

83. Had appropriate due diligence been done, diligent and loyal counsel would have been able to shift the majority of the $100 million allocated to the shell companies back to ADG and the ESOT in the deal. The Georgia business, valued at around $50 million, was ADG by another name. One hundred percent of its employees, from the clinic staff to the back-office to the executive suite, were ADG employees. ADG provided the start-up capital and oversaw its growth from one center to a chain of six centers. Akumin acknowledged that the Georgia shell company had no value without ADG. Yet the ESOT received not a single dollar associated with ADG's role in the Georgia business. Had Zeller counseled GreatBanc to withhold consent to the Akumin deal until it understood ADG's role in the Georgia business, the ESOT would have been able to negotiate that all or most of the Georgia shell company proceeds be shifted back to ADG in the deal. Alternatively, the ESOT would have developed a strong claim for corporate usurpation and waste against ADG's directors and officers worth the same amount.

84. The firm acquired by ADG's directors through a separate shell company in 2018 notwithstanding the competition bar accounted for the other half of the $100 million. Due diligence on this business would have shown that the nearly three-fold increase in value in one year was attributable in substantial part to ADG. The company's valuation for purposes of allocating the Akumin deal proceeds was built on synergies with ADG and other assets contributed to the company by ADG. Due diligence also would have shown that ADG received zero compensation or valuation consideration for its services or assets contributed to this supposed "outside" company. Due diligence should have looked farther back and determined that ADG's directors usurped the acquisition opportunity from ADG (*see supra* ¶¶ 65-68),

justifying an award of the entire gain to ADG and the ESOT. But even if the inquiry stopped short of that conclusion, the ESOT would have been able to shift a substantial part of the company's gain between 2018 and 2019 to ADG for uncompensated services and other contributions.

85. After causing ESOT beneficiaries to forgo tens of millions of dollars in distributions by failing to press ButcherJoseph's clients for due diligence on the shell companies, Zeller set to work on the only part of the deal that he thought he needed to consider: the split of ADG proceeds between the ESOT and warrant holders. Because the ESOP was being terminated long before all the shares held by the ESOT could be allocated to employees, the IRA provision governing such an event kicked in and called for half the ESOT's unallocated shares to be disregarded (*see supra* ¶ 51). This positioned the warrant holders to claim the majority of the equity value attributed to ADG and yielded the initial offer of only $9 million.

86. After GreatBanc's financial advisor expressed concern that it would not be able to support a valuation of the ESOT's interest at the price offered, the parties agreed to a small adjustment to arrive at the final ESOT proceeds of $10.4 million, which Zeller advised GreatBanc to accept.

87. This outcome was unusually favorable to ButcherJoseph's client and Mosaic, as it was standard by this time to award all unallocated shares to ESOT participants in the event of an early termination, not just half. Had all ESOT shares been allocated consistent with industry standard at the time, the ESOT would have received $2 million more. Prudent and loyal counsel would not have accepted less, and Zeller's advice to GreatBanc to stand down protected the benefit of favorable warrant terms for ButcherJoseph's client and Mosaic.

### E. Defendants' Malpractice Continued After the ESOT Termination Transaction.

88. Defendants' legal representation did not end when the Akumin transaction closed and the ESOP was terminated. Zeller and MVA continued to serve as counsel to GreatBanc in its capacity as ESOT trustee, and GreatBanc continued to rely on Zeller and MVA for advice and counsel concerning the interests of the ESOT and its beneficiaries. Although the ESOP was "terminated" in May 2019 when the Akumin deal closed, termination of an employee benefit plan does not dissolve the corresponding trust. The ESOT was expressly written to survive the termination of the ESOP and remain in place until all ESOT assets were distributed.

89. GreatBanc's service as ESOT trustee ended in March 2022. GreatBanc issued final distributions of Akumin deal proceeds to ESOT beneficiaries in November 2020. GreatBanc continued to pay other expenses from residual ESOT assets through December 2020. Some participant distributions were returned to the ESOT unpaid, and GreatBanc successfully completed all distributions in March 2022.

90. GreatBanc continued to view Zeller as its legal counsel with respect to the interests of the ESOT after the Akumin transaction closed, and Zeller acknowledged that role. In July 2019, after the Akumin deal closed and the ESOP was terminated, GreatBanc asked Zeller how future fees for legal services concerning the ESOT should be handled, and Zeller indicated that MVA would invoice for fees rather than require a new retainer deposit.

91. Zeller's post-termination legal counsel for the trustee included approving a release of indemnification claims that GreatBanc could bring for the benefit of the ESOT against ButcherJoseph's clients. The release agreement included a provision that ratified the ESOT and confirmed that the ESOT continued in full force and effect, notwithstanding the termination of the ESOP.

92. Zeller had an ongoing duty throughout the existence of the ESOT to disclose to GreatBanc that he maintained personal investments in parties adverse to the ESOT during his service as trustee counsel. Adequate disclosure of his personal investments would have allowed the trustee to independently reevaluate the actions recommended by Zeller and assert appropriate claims to remedy unfair transactions recommended by Zeller or hold Zeller and MVA accountable for the same. He never voluntarily disclosed his adverse interests, and his conflicts remained concealed until after GreatBanc's service as trustee concluded and Plaintiffs compelled his testimony in their lawsuit against GreatBanc and ButcherJoseph's clients (*see infra* ¶ 100).

93. Zeller failed to provide adequate legal counsel to GreatBanc concerning the ESOT's interests in the Akumin sale agreement. The Akumin sale agreement called for post-closing calculations and potential adjustments that would affect the proceeds ultimately received by the ESOT from the deal.

94. Under the Akumin sale agreement, the sale price would increase if ADG's working capital at closing was later determined to be higher than projected when the sale agreement was executed. Pursuant to the agreement, the increased sale price, if any, would be payable to ButcherJoseph's client, who was then responsible for distributing the payment pursuant to Schedule A of the agreement, which listed the ESOT as 100% owner of ADG shares.

95. The price adjustment calculation was not completed until January 31, 2020. The calculation resulted in an upward price adjustment of $1,342,809, and Akumin delivered that amount to ButcherJoseph's client on or after January 31, 2020. That client never paid it to the ESOT, as required by the sale agreement.

96. As the party responsible for providing legal counsel to the trustee with respect to the interests of the ESOT in the sale agreement, an attorney in Zeller's position would have

tracked the calculation of the price adjustment and followed up to ensure the calculations were performed and the money distributed properly.

97. Yet Zeller and MVA failed to take these actions, in breach of the duty of care that they owed to advance the interests of the trustee on behalf of the ESOT. If or when the money was not distributed in accordance with the sale agreement, Zeller and MVA should have advised GreatBanc of the violation and recommended a course of action to recover the monies, including litigation, if necessary. Defendants' failure to take these actions cost ESOT beneficiaries $1,342,809 to which they were entitled.

**DISCOVERY OF CLAIMS AND STANDING**

98. Plaintiffs bring this action derivatively on behalf of the ESOT and on behalf of similarly situated ESOT beneficiaries. Plaintiffs are all beneficiaries of the ESOT. Defendants' actions reduced the value of Plaintiffs' interests in the ESOT, ultimately reducing the distributions received from the ESOT by Plaintiffs.

99. Plaintiffs did not discover necessary facts concerning Zeller's advice to the trustee and communications with counterparties until March 2023, when the relevant communications started to be produced in Plaintiffs' action against ButcherJoseph's clients and GreatBanc, *Colon et al. v. Johnson et al.*, 8:22-cv-00888 (TPB-TGW) (M.D. Fla) (the "*Johnson* matter").

100. Plaintiffs did not discover Zeller's conflicts of interest with the ESOT until September 2023, when Zeller was deposed in the *Johnson* matter and asked questions concerning his relationships with other parties. He was compelled by oath to disclose that he owned part of ButcherJoseph, invested in Mosaic, was good friends with the ex-MVA attorney who founded ButcherJoseph and Mosaic, and has served as legal counsel to both ButcherJoseph and Mosaic.

101. Plaintiffs did not discover Defendants' malpractice until after Zeller's communications were produced and conflicts of interest disclosed in the *Johnson* litigation.

Plaintiffs could not have discovered Defendants' malpractice earlier. Plaintiffs were not included in any of the relevant communications and had no right to obtain trustee counsel's communications or disclosures concerning his personal investments and relationships until discovery in the *Johnson* litigation, which they pursued timely.

102. GreatBanc did not learn of Zeller's personal investments in ButcherJoseph and Mosaic until Zeller's September 2023 deposition in the *Johnson* litigation. By that time, GreatBanc had successfully completed the distribution of all ESOT assets to beneficiaries and no longer recognized itself as the trustee of the ESOT.

103. Plaintiffs have taken diligent actions to protect the ESOT's malpractice claims since Zeller's deposition in the *Johnson* matter.

104. In October 2023, ADG's successor company filed bankruptcy. Part of the company's proposed reorganization plan required broad releases and injunctions against legal proceedings brought by ADG's current or former owners. After being served notice of the proposed reorganization plan, Plaintiffs hired bankruptcy counsel and negotiated a carve out from the release and injunction for both the *Johnson* matter and the ESOT's legal malpractice claims against Zeller and MVA.[2]

105. Additionally, in November 2023, Plaintiffs asked GreatBanc to sue Zeller and MVA for legal malpractice on behalf of the ESOT. Typically, only a trustee can assert claims on behalf of a trust. The trustee has a fiduciary duty to do so when necessary to protect the interests of trust beneficiaries. *See* Restatement (Second) of Trusts § 177.

106. In December 2023, GreatBanc informed Plaintiffs that it longer recognized itself as ESOT trustee because all ESOT assets had been distributed to beneficiaries. Accordingly,

---

[2] *In re: Akumin Inc.*, 4:23-BK-90827, Doc. 272, ¶ 24a (S.D. Tex. Bankr.) (Nov. 30, 2023).

GreatBanc informed Plaintiffs that they could assert the ESOT's claims as beneficiaries, but GreatBanc would not.[3]

107. Effective January 19, 2024, Plaintiffs entered a tolling agreement with Zeller and MVA to exclude all time after January 19, 2024 with respect to any statute of limitations or statute of repose calculation.

108. In March 2024, Plaintiffs entered a class action settlement agreement with all defendants in the *Johnson* matter. Plaintiffs obtained a carve out from the settlement's release provision for claims against Zeller and MVA, including claims brought in a derivative capacity on behalf of the ESOT.[4]

109. On March 10, 2025, Plaintiffs notified Defendants that they were terminating the tolling agreement. The termination became effective on April 9, 2025, and Plaintiffs filed this action on April 11, 2025.

## CLASS ALLEGATIONS

110. Plaintiffs seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

111. Plaintiffs assert claims on behalf of a Class of beneficiaries of the ESOT defined as follows:

> All beneficiaries of the ESOT who vested in the ESOP and received a distribution, excluding any member of ADG's board of directors.

112. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. There are 185 members of the Class.

---

[3] Restatement (Second) of Trusts §§ 281–282.

[4] *Colon et al. v. Johnson et al.*, 8:22-cv-00888 (TPB-TGW), Doc. 273–1, ¶¶ 1.33.7 and 1.35 (M.D. Fla) (Mar. 28, 2024).

113. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are ESOT beneficiaries entitled to benefits from the ESOP, and they suffered injuries as a result of Defendants' legal malpractice. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOT. Defendants' improper actions affected all ESOT beneficiaries similarly.

114. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation involving ESOPs. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their abilities to represent such Class members.

115. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

A. Whether Zeller and MVA breached the standard of care owed to the trustee for the benefit of the ESOT;

B. Whether Zeller and MVA's breaches of the standard of care caused losses to the ESOT and its beneficiaries;

C. How losses should be allocated between ESOT beneficiaries;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

116. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members.

117. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be

dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

118. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described herein applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting complex claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

119. Plaintiffs and undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## COUNT I
## LEGAL MALPRACTICE

120. Plaintiffs incorporate the preceding allegations as if set forth fully herein.

121. Zeller and MVA represented GreatBanc in its capacity as trustee of the ESOT serving the interests of the ESOT and its beneficiaries.

122. The ESOT and its beneficiaries were the intended beneficiaries of the engagement for legal services between GreatBanc and MVA.

123. In addition to their status as third-party beneficiaries, Plaintiffs may sue MVA and Zeller directly as a result of the absence of an ESOT trustee, the ESOT trustee's refusal to bring suit, and the ESOT's transfer of all its assets into the possession of Plaintiffs and the class of ESOT beneficiaries.

124. Under the North Carolina rules of professional conduct, a lawyer is "subject to the disciplinary authority of North Carolina, regardless of where the lawyer's conduct occurs." N.C. Rule 8.5(a). A "lawyer may be subject to the disciplinary authority of both North Carolina and another jurisdiction for the same conduct." *Id.*

125. North Carolina, Florida, and Illinois rules of professional conduct prohibit a representation that is "materially limited . . . by a personal interest of the lawyer." N.C. Rule 1.7(a)(2); Fla. Rule 4-1.7(a)(2); Ill. Rule 1.7(a)(2).

126. North Carolina, Florida, and Illinois rules of professional conduct prohibit a lawyer from knowingly acquiring a pecuniary interest adverse to a client. N.C. Rule 1.8(a) (lawyer shall not "knowingly acquire an ownership, possessory, security or other pecuniary interest directly adverse to a client"); Fla. Rule 4-1.8(a) (lawyer is prohibited from "knowingly acquiring an ownership, possessory, security, or other pecuniary interest adverse to a client"); Ill. Rule 1.8(a) (lawyer shall not "knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client").

127. Disclosure and informed consent are critical to the attorney-client relationship. A client can waive a conflict of interest if the terms of the transaction are "fair and reasonable," the conflict is "fully disclosed . . . in writing," the client is given the opportunity to seek "advice of

independent counsel," and "the client gives informed consent[] in a writing." N.C. Rule 1.8(a)(1)-(3); *see also* Fla. Rule 4-1.8(a)(1)-(3); Ill. Rule 1.8(a)(1)-(3). Lawyers must explain matters to clients to the "extent reasonably necessary to permit the client to make informed decisions regarding the representation." N.C. Rule 1.4(b); Fla. Rule 4-1.4(b); Ill. Rule 1.4(b).

128. Because a law firm partner acts as an agent of the firm, a law firm is vicariously liable for acts of professional malpractice by that agent committed within the scope of their duties.

129. Zeller and MVA had a duty of care to the ESOT and its beneficiaries and a duty to advise the trustee with diligence and care for the interests of the ESOT and its beneficiaries. They also had a duty of loyalty and to provide legal advice that was solely in the interests of the ESOT and its beneficiaries.

130. In reviewing the ESOT's acquisition of ADG, related-party transactions, the Akumin deal, events following the Akumin deal, and advising GreatBanc concerning the ESOT's interests in the same, Zeller and MVA failed to exercise due care free of their conflicts of interests. They also failed to identify and advise the ESOT to assert legal claims against ButcherJoseph's clients for their violations of their duties to the ESOT as shareholder under corporate law, including claims for breach of fiduciary duty, usurpation of business opportunities, and waste, which was necessary to protect the ESOT and its beneficiaries.

131. As a result of Zeller's and MVA's breaches of the duty of care and duty of loyalty, the ESOT received tens of millions of dollars less in proceeds from the operation of the ESOT and sale of its shares than it would have had the trustee been capably represented by an attorney zealously advocating on the ESOT's behalf. Zeller and MVA's breaches of duty proximately caused these damages to the ESOT and its beneficiaries.

132. This additional money would have been paid to the accounts of ESOT beneficiaries and ultimately distributed to ESOT beneficiaries, including Plaintiffs.

## PRAYER FOR RELIEF

133. Plaintiffs pray for the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as the class representatives, and their counsel as class counsel;

B. Determine that Zeller and MVA committed professional malpractice in the representation of the trustee for the benefit of the ESOT;

C. Award monetary damages resulting from the acts and omissions constituting professional malpractice in an amount to be determined at trial;

D. Award pre- and post-judgment interest;

E. Award attorneys' fees on a common fund basis;

F. Distribute recovered sums to ESOT beneficiaries on a *pro rata* basis in proportion to their interests in the ESOT;

G. Order any other relief the Court considers just and equitable.

Dated: July 22, 2026

**ENGSTROM LEE LLC**

/s/Jennifer K. Lee
Jennifer K. Lee, MN No. 0399012*
Carl F. Engstrom, MN No. 0396298*
Melissa A. Carrington, IA No. 13033*
323 Washington Ave. N., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
jlee@engstromlee.com
cengstrom@engstromlee.com
mcarrington@engstromlee.com

* admitted *Pro Hac Vice*

**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLC**
Jean S. Martin, N.C. No. 25703
17 E. Main Street, Suite 200
Pensacola, FL 32502

(850) 202-1010
jmartin@awkolaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 22, 2026, the foregoing was electronically filed using the CM/ECF system, causing a Notice of Electronic Filing to be transmitted to all counsel of record.

/s/Jennifer K. Lee
Jennifer K. Lee